EL PUEBLO DE PUERTO RICO, recurrido, *v.* ÁNGEL PÉREZ CASI-LLAS, RAFAEL MORENO MORALES y JOSÉ M. LANDRÓN, acusa-dos y peticionario el último.

*Número:* CE-89-183 *Resuelto:* 29 de junio de 1990

*Ángel Viera Martínez*, abogado del peticionario; *Alejandro Salgado Rivera, Fiscal Especial Independiente*, abogado de El Pueblo.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

Una vez más llega ante nuestra consideración una controversia relacionada con los sucesos acaecidos el 25 de julio de 1978 en

el Cerro Maravilla. Sin embargo, el planteamiento al que hoy nos enfrentamos varía de lo hasta ahora resuelto en la medida en que requiere un análisis y juicio sobre el ámbito de la jurisdicción del Fiscal Especial Independiente designado en relación con los referidos sucesos del Cerro Maravilla.

I

En virtud de los poderes que le confiere la Ley Núm. 1 de 18 de enero de 1985 (3 L.P.R.A. sec. 9), el referido Fiscal Especial Independiente —en adelante F.E.I.— radicó acusaciones por dos (2) cargos de asesinato en primer grado contra Ángel Luis Pérez Casillas y Rafael Moreno Morales por la muerte de Carlos Soto Arriví y Arnaldo Darío Rosado ante el Tribunal Superior de Puerto Rico, Sala de San Juan. Tras el correspondiente juicio, el Jurado rindió veredicto absolutorio en ambos cargos con relación al coacusado Ángel Luis Pérez Casillas y de asesinato en segundo grado en uno de los cargos contra Rafael Moreno Morales y veredicto absolutorio en el otro. Finalizado el proceso judicial el 18 de marzo de 1988, el Jurado fue disuelto. Posteriormente, en el periódico *The San Juan Star*, en sus ediciones de 23, 24, 25 y 29 de marzo de 1988 se publicó, bajo la firma del periodista Manuel (Manny) Suárez, informaciones referentes a alegadas "irregularidades" que tuvieron lugar durante el secuestro y deliberación del Jurado en este caso, "irregularidades" que, de haber efectivamente sucedido, podrían desembocar en la radicación de cargos criminales por violaciones a distintas disposiciones del vigente Código Penal de Puerto Rico. El periodista Manny Suárez aseguró, mediante declaración jurada a esos efectos, que obtuvo esa información por medio de entrevistas realizadas a miembros del panel de jurados, a quienes garantizó completa confidencialidad respecto a sus identidades.

Fundamentado en las alegadas "irregularidades", el F.E.I. radicó una moción ante el tribunal de instancia el 21 de julio de 1988 *solicitando autorización para interrogar en corte abierta a los miembros del Jurado y sus familiares*; ello con el aparente

propósito de posteriormente radicar acusaciones criminales contra dichas personas. El 21 de noviembre de 1988 dicho foro judicial —Hon. Luis Raúl Cruz Jiménez— emitió una resolución autorizando al F.E.I. a interrogar en corte abierta a los doce jurados, los jurados suplentes y sus familiares.

Inconforme, uno de los miembros del panel de jurados, Sr. José M. Landrón, compareció ante nos —vía *certiorari*— impugnando dicha resolución. En el recurso que radicara le imputó al foro de instancia la supuesta comisión de siete (7) errores.(1) Mediante resolución de fecha 31 de marzo de 1989, le concedimos término al F.E.I. para que mostrara causa por la cual este Tribunal no debía expedir el auto de *certiorari* radicado y dictar sentencia revocatoria de la resolución emitida por el tribunal de instancia el 21 de noviembre de 1988. En particular, se le requirió al F.E.I. que ilustrara al Tribunal sobre su facultad en ley para llevar a cabo el procedimiento en controversia y sobre la corrección en sí de dicho procedimiento. La Oficina del F.E.I. ha comparecido. Estando en posición de resolver, lo hacemos sin ulterior trámite.

## II

Entendemos procedente, de entrada, exponer los argumentos en los cuales el recurrido F.E.I. se basa para sostener su "facultad" de llevar a cabo los procedimientos impugnados por el recurrente José M. Landrón. Como es sabido, la Ley Núm. 1, ante, creó el cargo de F.E.I. con el propósito de que se realizara una investigación imparcial de los incidentes que tuvieron lugar el

---

(1) Los siete (7) errores señalados consisten, en síntesis, en: (1) autorizar al Fiscal Especial Independiente (en adelante F.E.I.) a interrogar a los jurados y familiares de éstos mediante un procedimiento que viola los derechos constitucionales del peticionario; (2) declarar sin lugar su solicitud de dejar sin efecto el interrogatorio utilizado; (3) actuar sobre la moción para que se deje sin efecto su resolución previo a resolverse la moción de inhibición; (4) falta de jurisdicción del tribunal para convocar en Sala a los jurados que intervinieron en el caso; (5) no permitirle ejercer su derecho a argumentar en Sala; (6) falta de autoridad del F.E.I., y (7) declarar sin lugar la moción de inhibición. Debido a la conclusión a que llegamos, resulta innecesario la discusión por separado de cada uno de los errores levantados.

25 de julio de 1978 en el Cerro Maravilla.(2) La referida legislación le encomendó y le concedió al F.E.I. el deber y la autoridad *para investigar y procesar con carácter exclusivo todo lo relacionado con los referidos acontecimientos y su posterior encubrimiento.* En su Art. 2, la Ley Núm. 1, *supra,* señala *el alcance de la jurisdicción del F.E.I.* A estos efectos dispone:

Artículo 2.—Encomienda y Jurisdicción

El Fiscal Especial Independiente tendrá el deber y la autoridad de investigar todo lo relacionado con los incidentes del Cerro Maravilla ocurridos el 25 de julio de 1978 para determinar la comisión de delitos por parte de funcionarios públicos o de otras personas, así como violaciones a reglamentos gubernamentales y a normas de buena conducta administrativa y profesional. Una vez hecha esa determinación tendrá el deber y la autoridad de representar al Pueblo de Puerto Rico y al Estado Libre Asociado en los procedimientos penales y en las acciones civiles, administrativas y de conducta profesional que procedan.

Sin que ello constituya una limitación, el Fiscal Especial Independiente deberá investigar y procesar los delitos y violaciones administrativas y de ética profesional que surjan de las siguientes áreas:

(1) Lo ocurrido el día 25 de julio de 1978 en el Cerro Maravilla.
(2) Lo ocurrido con antelación al 25 de julio de 1978 pero relacionado con los sucesos acaecidos ese día.
(3) *Lo ocurrido con posterioridad al 25 de julio de 1978 y que esté relacionado con esos acontecimientos.*
(4) Lo ocurrido en la investigación llevada a cabo por el Senado de Puerto Rico sobre los sucesos del 25 de julio de 1978 en el Cerro Maravilla.
(5) Todo lo relacionado con las acciones u omisiones de agentes encubiertos en relación a los incisos anteriores. (Énfasis suplido.) 1985 Leyes de Puerto Rico 11.

El F.E.I. alega, en síntesis, que el transcrito inciso (3) del Art. 2 de la citada Ley Núm. 1 le faculta para llevar a cabo la investigación objeto de este recurso. A esos efectos sostiene que las supuestas "irregularidades" que pretende investigar están

---

(2) Véase Exposición de Motivos de la Ley Núm. 1 de 18 de enero de 1985 (1985 Leyes de Puerto Rico 3).

indirectamente relacionadas con los sucesos ocurridos el 25 de julio de 1978.

## III

▮ No podemos acceder a la pretensión del recurrido. Sabido es que en nuestra tarea de interpretar estatutos, hemos adoptado un enfoque restrictivo cuando nos enfrentamos a las excepciones de un principio general. Véanse: *Salazar v. El Registrador*, 27 D.P.R. 63, 66–67 (1919); *Ex parte Ramos*, 53 D.P.R. 374, 379 (1938); *De Castro v. Junta Comisionados*, 59 D.P.R. 676, 680 (1942); R.E. Bernier, *La Accesión en Puerto Rico*, Barcelona, 1970, pág. 129; R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 475 y jurisprudencia allí citada. Véanse, además, en el ámbito federal: *Shilkret v. Musicraft Records*, 131 F.2d 929, 931 (2do Cir. 1942), *cert.* denegado, 319 U.S. 742 (1943); *Edward B. Marks Music Corp. v. Colorado Mag. Inc.*, 497 F.2d 285, 288 (10mo Cir. 1974), *cert.* denegado, 419 U.S. 1120 (1975); *U.S. v. State of California*, 504 F.2d 750, 754 (Temp. Emer. Ct. App. 1974), *cert.* denegado, 421 U.S. 1015 (1975); *Alabama Power Co. v. Costle*, 636 F.2d 323, 358 (Cir. D.C. 1979); *Colo. Dept. of Soc. Serv. v. Dept. of Health*, 558 F. Supp. 337, 351 (Colo. D.C. 1983).

▮ A tono con lo expuesto, hemos resuelto que la autorización que se concede a funcionarios públicos para casos específicos, y no en forma general, *debe ser interpretada de manera restrictiva.* Véanse: *White Star Bus Line, Inc. v. Sánchez*, 59 D.P.R. 748, 752 (1942);(3) Bernier y Cuevas Segarra, *op. cit.*, pág. 472.

---

(3) En *White Star Bus Line, Inc. v. Sánchez*, 59 D.P.R. 748, 752 (1942), resolvimos que por ser la autorización al Comisionado del Interior —para ordenar que se ocupen las tablillas de cualquier porteador público— una concedida para casos específicos, no era susceptible de extensión y debía interpretarse restrictivamente.

■ *Igual tratamiento e interpretación restrictiva se impone en el presente caso.* Como es sabido, en nuestra jurisdicción la facultad y responsabilidad de investigar, acusar, y procesar alegada conducta constitutiva de delito público recae, *de ordinario y como regla general,* en la persona del Secretario del Departamento de Justicia de Puerto Rico y de los fiscales que están adscritos al referido Departamento. Véase 3 L.P.R.A. secs. 72, 90, 91 y 95.

· ■ Ello no obstante, la Asamblea Legislativa de Puerto Rico en años recientes ha entendido procedente crear el cargo de "Fiscal Especial Independiente" con el propósito de que éste actúe como tal —y en sustitución, o en lugar, del Secretario y los fiscales del Departamento de Justicia— *en relación con ciertas, específicas y determinadas situaciones de hechos.* Tal es el caso del F.E.I. designado específicamente para investigar los "Sucesos del Cerro Maravilla", creado el cargo mediante la citada Ley Núm. 1 y el de los "Fiscales Especiales Independientes", la designación de los cuales contempla y autoriza la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z) "bajo la supervisión de un Panel nombrado por el Gobernador del Estado Libre Asociado de Puerto Rico y compuesto exclusivamente por Ex Jueces del Tribunal Supremo o Superior, o de ambos", el cual mecanismo "garantiza la absoluta objetividad de investigaciones contra altos funcionarios del Gobierno".(4)

■ El Tribunal Supremo de Estados Unidos, en fecha reciente, al pasar juicio sobre la constitucionalidad de la legislación federal conocida como la "Ley de Ética Gubernamental de 1978" —*legislación que sirvió de base a la nuestra sobre la figura del "Fiscal Especial Independiente", en específico a la antes citada Ley Núm. 2 de 1988*— se manifestó sobre el "alcance de la jurisdicción" de estos funcionarios. A esos efectos, expresó dicho

---

(4) Véase Exposición de Motivos de la referida Ley Núm. 2 de 23 de febrero de 1988, Leyes de Puerto Rico, pág. 6.

Foro en *Morrison v. Olson*, 101 L.Ed.2d 569 (1988), en lo pertinente que:

> . . . *appellant is empowered by the Act to perform only certain, limited duties.* An independent counsel's role is restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes. Admittedly, the Act delegates to appellant "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice," Sec. 594(a), but this grant of authority does not include any authority to formulate policy for the Government or the Executive Branch, nor does it give appellant any administrative duties outside of those necessary to operate her office. The Act specifically provides that in policy matters appellant is to comply to the extent possible with the policies of the Department. Sec. 594(f).
>
> Third, *appellant's office is limited in jurisdiction.* Not only is the Act itself restricted in applicability to certain federal officials suspected of certain serious federal crimes, *but an independent counsel can only act within the scope of the jurisdiction that has been granted* by the Special Division pursuant to a request by the Attorney General. Finally, appellant's office is limited in tenure. There is concededly no time limit on the appointment of a particular counsel. Nonetheless, the office of independent counsel is "temporary" in the sense *that an independent counsel is appointed essentially to accomplish a single task,* and when that task is over the office is terminated, either by the counsel herself or by action of the Special Division. *Unlike other prosecutors, appellant has no ongoing responsibilities that extend beyond the accomplishment of the mission that she was appointed for and authorized* by the Special Division to undertake. In our view, these factors relating to the "ideas of tenure, duration . . . and duties" of the independent counsel, *Germaine,* supra, at 511, 25 L.E[d]. 482, are sufficient to establish that appellant is an "inferior" officer in the contitutional sense. (Énfasis suplido.)

 Por otro lado, e igualmente a manera de ilustración, en el estado de Nueva York —jurisdicción donde se ha experimentado un amplio desarrollo en cuanto a la figura del "Fiscal Especial Independiente"— se ha resuelto que cuando la conducta o actividad que se pretende investigar *no está específicamente señalada o comprendida* dentro del marco de la jurisdicción

investigativa concedida al F.E.I., le corresponde a los fiscales "regulares" la investigación y procesamiento de la referida conducta delictiva. Véanse: *Dondi v. Jones*, 382 N.Y.S.2d 801, 804 (1976); *People v. Sam*, 372 N.Y.S.2d 659, 660 (1975); *People v. DiFalco*, 406 N.Y.S.2d 279, 281 (1978); *People v. Blumenthal*, 389 N.Y.S.2d 579, 581 (1976).[5]

## IV

Es correcto que en *Pueblo v. González Malavé*, 116 D.P.R. 578 (1985), le reconocimos al F.E.I. amplias facultades para representar al Estado en relación con los "Sucesos del Cerro Maravilla". Esos amplios poderes, sin embargo, tienen que ser desempeñados por dicho funcionario en relación con los asuntos que están o caen *dentro del marco de su encomienda*. No podemos perder de perspectiva que toda concesión de jurisdicción, por más amplia y abarcadora que resulte, necesariamente conlleva unos límites. En el caso de los Fiscales Especiales —*a quienes por su naturaleza excepcional se les concede una encomienda específica*— resulta de particular importancia que deslindemos cuidadosamente el alcance de la jurisdicción de éstos, tomando en consideración, repetimos, que como regla general la jurisdicción para investigar y procesar los delitos que se cometen en Puerto Rico corresponde al Departamento de Justicia y que, *sólo en circunstancias excepcionales*, se justifica la intervención de un fiscal especial; *no teniendo dichos funcionarios la facultad para determinar el alcance de su propia jurisdicción.*

La investigación y —si jurídicamente procedente— el procesamiento criminal de ciudadanos por alegados y supuestos actos delictivos relacionados con la actuación y conducta obser-

___

(5) Para un recuento sobre la figura del Fiscal Especial Independiente en otras jurisdicciones, véanse: Comentario, *The Independent Counsel Mess*, 101 Harv. L. Rev. 105 (1988); *A Symposium on Special Prosecutions and the Role of the Independent Counsel*, 16 Hofstra L. Rev. 1 (1987); Nota, *Validity, Under State Law of Appointment of Independent Special Prosecutor to Handle Political or Controversial Prosecutions or Investigations of Persons Other Than Regular Prosecutor*, 84 A.L.R. 3d 29 (1978).

vada por el Jurado en el proceso criminal en controversia, ciertamente *no tiene relación directa alguna* con los lamentables hechos ocurridos el 25 de julio de 1978 ni con el posterior encubrimiento de los mismos. Adoptar la tesis del recurrido F.E.I. —esto es, que el inciso (3) del Art. 2 de la citada Ley Núm. 1 le concede jurisdicción para investigar la conducta en controversia por razón de que la misma está *indirectamente* relacionada con los "Sucesos del Cerro Maravilla"— tendría *la absurda consecuencia* de que sería de la exclusiva jurisdicción de dicho funcionario la investigación de toda *alegada posible conducta delictiva* que, desafortunadamente, pudiera ocurrir de hoy en adelante y que tenga *alguna* relación —por incidental y remota que la misma sea— con cualquiera de los procedimientos judiciales o administrativos en que actualmente esté involucrada la Oficina del F.E.I. o con los distintos funcionarios adscritos a dicha oficina, *lo cual permitiría la perpetuación de dicho funcionario en su cargo.* Ello, obviamente, no fue la intención de la Asamblea Legislativa al aprobar la citada Ley Núm. 1.

■ Por los fundamentos antes expresados, resolvemos que la conducta que pretende investigar en el presente caso el F.E.I. —esto es, la posible comisión de delito durante el proceso de deliberación y secuestro del Jurado que intervino en el juicio criminal que por el delito de asesinato en primer grado se celebrara ante el Tribunal Superior de Puerto Rico, Sala de San Juan, contra los ex policías Ángel L. Pérez Casillas y Rafael Moreno Morales— es una que no corresponde realizar al referido funcionario por ser la misma una remota e incidental a los "Sucesos del Cerro Maravilla" y que, por lo tanto, no forma parte de la encomienda jurisdiccional que al F.E.I. le concediera el legislador mediante la referida Ley Núm. 1.

■ En consecuencia, *se expide el auto de "certiorari" radicado por el peticionario José M. Landrón y se dictará*

*sentencia revocatoria de la resolución emitida por el tribunal de instancia de fecha 21 de noviembre de 1988.*(⁶)

El Juez Asociado Señor Hernández Denton emitió opinión disidente. La Juez Asociado Señora Naveria de Rodón se inhibió.

—O—

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton.

Por octava ocasión nos corresponde resolver otra controversia jurídica originada por la investigación y acusaciones formuladas como resultado de los sucesos del Cerro Maravilla. *Pueblo v. Pérez Casillas,* 117 D.P.R. 380 (1986); *Pueblo v. González Malavé,* 116 D.P.R. 578 (1985); *Romero Barceló v. Hernández Agosto,* 115 D.P.R. 368 (1984); *Peña Clos v. Cartagena Ortiz,* 114 D.P.R. 576 (1983); *Soto v. Srio. de Justicia,* 112 D.P.R. 477 (1982). La controversia particular ante nos requiere un análisis sobre el alcance del poder investigativo del Fiscal Especial Independiente (F.E.I.). Por entender que la ley que crea el F.E.I. le confiere a éste jurisdicción para investigar irregularidades como la de autos y que ese tipo de investigación está dentro del ámbito de su encomienda, disiento de la opinión del Tribunal.

I

El F.E.I. presentó acusaciones por dos (2) cargos de asesinato en primer grado contra Ángel Luis Pérez Casillas y Rafael Moreno Morales por las muertes de Arnaldo Darío Rosado y Carlos Soto Arriví el 25 de julio de 1978 en el Cerro Maravilla. Véanse: M. Suárez, *Requiem on Cerro Maravilla,* Nueva Jersey, Waterfront Press, 1987; A. Nelson, *Murder Under Two Flags,*

_____

(⁶) La conclusión a la que llegamos hace innecesario que nos expresemos sobre la propiedad y procedencia jurídica del "método" utilizado por el F.E.I. para investigar las supuestas irregularidades. El mismo, cuando menos, resulta ser altamente preocupante. Las investigaciones que lleva a cabo el Ministerio Fiscal *no* se realizan, de ordinario, en "corte abierta".

Nueva York, Tickmor S. Fields, 1986. Un Jurado absolvió de ambos cargos a Pérez Casillas y encontró culpable a Moreno Morales de un cargo de asesinato en segundo grado.

Posteriormente, el periodista Manuel (Manny) Suárez publicó unos artículos en las ediciones de 23, 24, 25 y 29 de marzo de 1988 en el periódico *The San Juan Star*, en los cuales revelaba que se cometieron serias irregularidades durante el proceso de secuestro y deliberación del Jurado que impidieron un veredicto imparcial.

El 21 de julio de 1988 el F.E.I. presentó una moción en el Tribunal Superior, Sala de San Juan, en la cual solicitaba autorización para interrogar en corte abierta a los miembros del Jurado y a sus familiares. El 21 de noviembre de 1988 el Juez Luis Raúl Cruz Jiménez emitió una resolución mediante la cual accedió a la solicitud del F.E.I. Inconforme con ese dictamen, uno de los miembros del panel de jurados presentó una petición de *certiorari* ante este Tribunal para cuestionar esa resolución.

El 31 de marzo de 1989 le concedimos al F.E.I. término para que mostrara causa por la cual no debíamos expedir el auto solicitado y revocar la resolución recurrida. Oportunamente el F.E.I. compareció y expuso su posición.

II

Con el propósito de investigar la muerte de dos jóvenes independentistas a manos de agentes del orden público en el Cerro Maravilla el 25 de julio de 1978 y las actuaciones posteriores de los funcionarios de la Rama Ejecutiva, responsables de poner en vigor las leyes, la Asamblea Legislativa creó el 1ro de enero de 1985 el cargo de F.E.I. La Exposición de Motivos de la Ley Núm. 1 de 18 de enero de 1985 (3 L.P.R.A. sec. 90n) revela claramente la intención legislativa de crear una entidad independiente con amplios poderes investigativos para llevar a cabo una investigación de naturaleza criminal y exhaustiva con el fin de fijar responsabilidad por las trágicas muertes de los jóvenes independentistas y por su posterior encubrimiento por cualquier funcionario de la Rama Ejecutiva.

Las circunstancias excepcionales que rodean estos sucesos han despertado un clamor unánime para que se realice una investigación imparcial, eficiente y completa, y para que se fije la responsabilidad criminal que corresponda por dichas muertes y su posterior encubrimiento. Dicha investigación necesariamente ha de envolver el examen de las actuaciones de los funcionarios de mayor rango en la investigación criminal dentro de la jerarquía gubernamental. Las graves irregularidades descubiertas por el Senado en las investigaciones criminales previas, enfatizan la necesidad de evitar la más leve sombra de conflicto de intereses entre los investigadores y los investigados y de separar dicho proceso de las pasiones político-partidistas.

Existe consenso en el país de que dicha investigación no debe ser realizada por los organismos tradicionales de investigación criminal. Es necesario garantizarle al pueblo que se realizará una investigación enmarcada dentro de las más estrictas normas éticas, de manera que recupere su confianza en nuestras instituciones democráticas, y la certeza de que ningún ciudadano se encuentra por encima de la ley.

Con ese propósito, se propone la creación de un cargo de Fiscal Especial Independiente, al cual se le proveen todos los poderes y recursos necesarios para que realice una investigación completa, imparcial e independiente, sobre los sucesos acaecidos en el Cerro Maravilla el 25 de julio de 1978, sus antecedentes y su posterior encubrimiento, y que se procese criminalmente a todas las personas que pudiesen haber cometido delitos relacionados con los hechos. 1985 Leyes de Puerto Rico 3.

A tenor con este propósito se promulgó la Ley Núm. 1, *supra.* El Art. 2 de la citada Ley Núm. 1 delimita la encomienda y la jurisdicción del F.E.I.:

El Fiscal Especial Independiente tendrá el deber y la autoridad de *investigar todo lo relacionado* con los incidentes del Cerro Maravilla ocurridos el 25 de julio de 1978 para determinar la *comisión de delitos* por parte de funcionarios públicos o de otras personas, así como violaciones a reglamentos gubernamentales y a normas de buena conducta administrativa y profesional. Una vez hecha esa determinación tendrá el deber y la autoridad de representar al Pueblo de Puerto Rico y al Estado Libre Asociado en los procedimientos penales y en las acciones civiles, administrativas y de conducta profesional que procedan.

*Sin que ello constituya una limitación,* el Fiscal Especial Independiente deberá investigar y procesar los delitos y violaciones administrativas y de ética profesional que surjan de las siguientes áreas:

(1) Lo ocurrido el 25 de julio de 1978 en el Cerro Maravilla.

(2) Lo ocurrido con antelación al 25 de julio de 1978 pero relacionado con los sucesos acaecidos ese día.

(3) *Lo ocurrido con posterioridad al 25 de julio de 1978 y que esté relacionado con esos acontecimientos.*

(4) Lo ocurrido en la investigación llevada a cabo por el Senado de Puerto Rico sobre los sucesos del 25 de julio de 1978 en el Cerro Maravilla.

(5) Todo lo relacionado con las acciones u omisiones de agentes encubiertos en relación a los incisos anteriores. (Énfasis suplido.) 1985 Leyes de Puerto Rico 11.

En primer lugar, cabe apuntar que no existe disposición de ley alguna que le prohíba al F.E.I. investigar la conducta de los jurados y de sus familiares para determinar si se cometieron delitos. Por otro lado, un análisis del Art. 2 de la Ley Núm. 1, *supra*, revela que el F.E.I. sí tiene jurisdicción para investigar irregularidades como la de autos y que este tipo de investigación está dentro de su encomienda. Veamos.

El citado Art. 2 de la Ley Núm. 1, *supra*, le confiere al F.E.I. la facultad de investigar *"todo lo relacionado"* con los sucesos del Cerro Maravilla para determinar si se cometieron delitos y se incurrió en violaciones administrativas. Más aún, antes de enumerar áreas específicas en relación con las cuales el F.E.I. puede investigar y procesar, el estatuto aclara que esa enumeración *no constituye una limitación a las facultades de investigación y procesamiento del F.E.I.*

El estatuto no limita la jurisdicción del F.E.I. a investigar únicamente los actos directamente relacionados con los sucesos del Cerro Maravilla ni excluye los que estén "indirectamente" relacionados. Todo lo contrario, el estatuto faculta al F.E.I. para investigar *"todo lo relacionado con los incidentes del Cerro Maravilla"*. La *mens legis* fue realmente proveerle "todos los poderes y recursos necesarios para realizar" *una investigación completa,* imparcial e independiente. Al amparo de estas faculta-

des, corresponde al F.E.I. averiguar si se violó la ley o los reglamentos administrativos. Del resultado de esa investigación dependerá si el F.E.I. puede o no formular una querella, o acusación, según sea el caso. Sin embargo, es a dicho funcionario a quien inicialmente le compete determinar si los actos investigados están relacionados con los sucesos del Cerro Maravilla. Véase *Comisionado de Seguros v. Bradley*, 98 D.P.R. 21 (1969).

De las informaciones que publicó el periódico *The San Juan Star* y de la investigación que comenzó a realizar el F.E.I. se desprende la posibilidad de que hayan ocurrido irregularidades durante el proceso de desinsaculación, violaciones al secuestro del Jurado durante el juicio —las cuales incluyen— contacto con terceros e irregularidades en el proceso de deliberación.

Específicamente, y a manera de ilustración, se alega que una de los jurados que intervino en el caso mintió durante el *voir dire* al ocultar su relación con el ex Gobernador Carlos Romero Barceló; que esa misma jurado trajo prueba extraña al proceso de deliberación para tratar de convencer a los demás jurados de que Soto Arriví y Darío Rosado habían participado en el tiroteo de los marinos en Sabana Seca el 3 de diciembre de 1979, dieciocho (18) meses después de los sucesos del Cerro Maravilla; que varios jurados discutieron el caso antes de ser sometido a su consideración; que un jurado suplente trató de convencer, previo a la deliberación, a varios miembros del panel de que emitieran su voto a favor de la absolución; que durante el secuestro del jurado se hicieron 1,526 llamadas desde los teléfonos provistos para los jurados y alguaciles; que varios jurados permanecieron a solas con sus familiares cuando debían estar secuestrados; que durante el secuestro uno de los jurados le informó a un alguacil que había sido amenazado y éste no se lo informó a su supervisor; que los jurados comentaron la prueba antes de que les sometieran el caso para su consideración, y que uno de los alguaciles que intervino en el caso participó en dos (2) fiestas como celebración del veredicto.

No cabe duda que las irregularidades imputadas durante el secuestro y deliberación de un Jurado están tipificadas como

delito en el Art. 247 del Código Penal, 33 L.P.R.A. sec. 4443,(1) y están relacionadas con los sucesos del Cerro Maravilla. Se trata precisamente del juicio que se ventilaba contra los presuntos asesinos de los jóvenes independentistas. Es evidente que, de ser ciertas las irregularidades imputadas por el destacado periodista Manny Suárez, éstas afectarán directamente la capacidad del F.E.I. para llevar a cabo su encomienda principal: el procesamiento de los responsables por los fatídicos sucesos del Cerro Maravilla.

No es correcto que el reconocimiento de esta facultad autoriza al F.E.I. a investigar y a procesar "toda alegada posible conducta delictiva que, desafortunadamente, pudiera ocurrir de hoy en adelante y que tenga alguna relación —por incidental y remota que la misma sea . . .". (Énfasis suprimido.) Opinión mayoritaria, pág. 713. En controversias jurídicas complejas no es prudente ni aconsejable recurrir a sofismas para fundamentar una posición especulativa o formular situaciones extremas para rebatir argumentos articulados para casos concretos.

En el caso de autos, uno de los periodistas que originalmente investigó y reveló los pormenores de los sucesos del Cerro Maravilla denunció la comisión de serias irregularidades en el juicio del Director de la División de Inteligencia de la Policía y la persona que alegadamente dirigió el operativo policiaco del Cerro Maravilla.

---

(1) *"Sec. 4443. Influir en jurado u otros*

"Será sancionada con pena de reclusión por un término fijo de seis (6) años, toda persona que intentare influir sobre algún juez, jurado o persona citada o sorteada como tal, o elegida o nombrada como árbitro, o persona autorizada por ley para oír y resolver una cuestión o controversia, por lo que respecta a su veredicto a [sic] decisión en cualquier causa o procedimiento que se hallare pendiente ante ella o que fuere a ser sometida a su resolución, valiéndose al efecto de algunos de los siguientes medios:

"(a) Cualquier comunicación, oral o escrita, tenida con dicha persona, excepto en el curso ordinario de los procedimientos.

"(b) Cualquier libro, papel o documento mostrádole fuera del curso regular de los procedimientos.

"(c) Cualquier amenaza, intimidación, persuasión o súplica.

"En cualquiera de las circunstancias anteriores, de mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cuatro (4) años.— Código Penal, 1974, art. 247; Junio 4, 1980, Núm. 101, p. 298, sec. 1."

No estamos en posición de determinar en qué medida estas irregularidades sucedieron, quiénes fueron los responsables ni tampoco si éstas tenían como propósito impedir que se le impusiera responsabilidad penal por las muertes ocurridas en el Cerro Maravilla. *Esa precisamente es la función del F.E.I.* Más aún, el Art. 6 de la Ley Núm. 1, *supra,* le confiere al F.E.I. *jurisdicción exclusiva* para investigar y procesar aquellas acciones penales que estime apropiadas dentro de la encomienda que le asigna el citado Art. 2.

La opinión del Tribunal ignora esta amplia delegación de poderes y recurre a técnicas de interpretación de estatutos concebidas para situaciones en las que no se puede determinar cuál fue la intención de la Asamblea Legislativa y recurre a jurisprudencia que no es pertinente a la controversia de autos. Véanse, en particular, *Salazar v. El Registrador,* 27 D.P.R. 63 (1919); *Ex parte Ramos,* 53 D.P.R. 374 (1938); *De Castro v. Junta de Comisionados,* 59 D.P.R. 676 (1942). En el caso de autos, el extenso historial legislativo revela claramente que se promulgó una ley de carácter excepcional para establecer un nuevo cargo con los poderes y recursos necesarios para investigar *todos los incidentes relacionados* con el Cerro Maravilla, sujeto a las garantías provistas por nuestro ordenamiento constitucional y estatutario. Véase, a modo de ejemplo, *E.L.A. v. Coca-Cola Bott. Co.,* 115 D.P.R. 197 (1984). Una vez se descubre la intención del Legislador, "el fin de la interpretación ha sido logrado y no resulta necesario aplicar ninguna regla de hermenéutica porque éstas no son sino una ayuda para determinar la voluntad que se busca".

Por otro lado, la opinión del Tribunal no contiene unas directrices claras sobre cuál es el alcance de la jurisdicción conferida al F.E.I. ¿Cuán remotos o incidentales tienen que ser los actos perpetrados para estar fuera de su ámbito investigativo? ¿Cómo se va a determinar si el acto es incidental o remoto? ¿En términos de tiempo? ¿Lugar? ¿Pertinencia? ¿Importancia del evento? ¿Personas involucradas? ¿Delitos imputados?

Finalmente, invocando aforismos y jurisprudencia que son inaplicables a la controversia de autos, la opinión del Tribunal

ignora la voluntad legislativa, enmienda indebidamente la ley orgánica del F.E.I. para limitar el alcance de su jurisdicción y emite unos pronunciamientos que debilitan dicho organismo e impiden que investigue si alguien intervino ilegalmente con el Jurado para evitar un juicio imparcial de los policías acusados de los actos perpetrados el 25 de julio de 1978 en el Cerro Maravilla.

Por las razones expuestas anteriormente, disiento.